QUESTION: Are rates charged consumers of regulated utility companies in Florida legal when such rates are unilaterally modified by the utility pursuant to an automatic fuel adjustment clause approved by the Florida Public Service Commission?
SUMMARY: The Florida Public Service Commission is without authority to permit regulated utility companies to modify rates for electric power pursuant to an automatic fuel adjustment clause without following statutory safeguards of Ch. 366, F.S. The power to modify or adjust rates is the power to set rates, and this is exclusively in the commission. It cannot be delegated. Chapter 74-196(5), Laws of Florida, extended jurisdiction of the commission to prescribing rate structures for municipal utilities and electric cooperatives. As of January 1, 1975, the Administrative Procedures Act will require public hearings in advance of rate modifications by municipal utilities and electric cooperatives. Underlying this question is the basic issue as to whether the Public Service Commission may legally authorize utility companies to modify any rate without first providing for a public hearing and following other commission procedures set out in Ch. 366, F.S. Inasmuch as I can find no statutory authority for the commission to permit utilities subject to their jurisdiction to unilaterally modify their rates for any reason, I have concluded that rates charged pursuant to a fuel adjustment clause — even when such clause is included in a tariff on file with the commission — are illegal. Controlling statutes are abundantly clear: The commission must order and hold public hearings before allowing any change in rates charged by regulated utility companies. Charges included in a customer's utility bill pursuant to a fuel adjustment clause, although set apart and denominated a fuel cost, are nonetheless rates within the meaning of Ch. 366, and charges which are unilaterally modified pursuant to such fuel adjustment clause amount to nothing more or less than an illegally adjusted rate. In AGO 074-288 I considered several questions concerning the legal effect of the lack of public hearings prior to modification of a tariff order by the PSC. Essentially, the issue raised therein was whether the tariffs collected pursuant to certain cited orders were "legitimate charges." I concluded that the orders had been accorded a degree of finality by virtue of the passage of time, and the payments made thereunder were "legitimate" in the sense that they were nonrefundable. The important question unanswered in AGO 074- 288, but squarely presented herein, is that which you have set forth, supra. Authority to franchise private companies to provide for public necessities such as power, fuel, communications, and transportation, and to establish rates they shall charge the public, is a legislative prerogative. Colen v. Sunhaven Homes, Inc., 98 So.2d 501 (Fla. 1957); Miami Beach Airline Service v. Crandon, 32 So.2d 153 (Fla. 1947). The legislature has delegated certain of this authority to the Public Service Commission. Title XXV, Chs. 350-368, F.S. Limits of the commission's powers are thus measured by the statutory scheme, and the commission may not legally exercise any authority not so delegated, expressly or by necessary implication. As the Supreme Court observed as recently as 1973 in City of Cape Coral vs. G.A.C. Utilities, Inc.,281 So.2d 493 (Fla. 1973), at page 496: . . . .[T]he Commission's powers, duties and authority are those and only those that are conferred expressly or impliedly by statute of the State. Any reasonable doubt as to the lawful existence of a particular power that is being exercised by the Commission must be resolved against the exercise thereof . . . and the further exercise of the power should be arrested. (Emphasis supplied.) Therefore, to determine whether the Public Service Commission may authorize regulated power companies unilaterally to modify their rates, we turn to the relevant statutes. In this regard, powers and duties of the commission are described in several pertinent sections. In setting them out below, appropriate emphasis has been supplied. 366.05
Powers. — (1) In the exercise of such jurisdiction, the commission shall have power to prescribe fair and reasonable rates and charges, classification, standards of quality and measurements, and service rules and regulations to be observed by each public utility . . . to prescribe all rules and regulations reasonably necessary and appropriate for the administration and enforcement of this chapter; and to exercise all judicial powers, issue all writs and do all things, necessary or convenient to the full and complete exercise of its jurisdiction and the enforcement of its orders and requirements. 366.06 Rates; procedure for fixing and changing. — (1) All rates being charged and collected by a public utility on May 9, 1951, shall be the lawful rates until changed in accordance with the rules, regulations or orders of the commission or court decree. Under rules and regulations to be prescribed by the commission every public utility shall, within ninety days after the effective date of such rules and regulations, file with the commission schedules showing all rates, classifications and charges for service of every kind furnished by it, and all rules and regulations relating thereto in effect on May 9, 1951. Thereafter current schedules shall be maintained on file with the commission on such forms and under such rules and regulations as the commission may prescribe. (2) A public utility shall not, directly or indirectly, charge or receive any rate not on file with the commission for the particular class of service involved, and no change shall be made in any schedule. All applications for changes in rates shall be made to the commission in writing under rules and regulations prescribed, and the commission shall have the authority to determine and fix fair, just and reasonable rates that may be requested, demanded, charged or collected by any public utility for its service. The commission shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall be used for rate-making purposes and shall be the money honestly and prudently invested by the public utility company in such property used and useful in serving the public, less accrued depreciation, and shall not include any good-will or going-concern value or franchise value in excess of payment made therefor. (3) Whenever the commission shall find, upon request made or upon its own motion, that the rates demanded, charged or collected by any public utility company for public utility service, or that the rules, regulations or practices of any public utility company affecting such rates are unjust, unreasonable, unjustly discriminatory, or in any wise in violation of law, or that such rates are insufficient to yield reasonable compensation for the services rendered, or that such service is inadequate or cannot be obtained, the commission shall order and hold a public hearing, giving notice to the public and to the utility company, and shall thereafter determine just and reasonable rates to be thereafter charged for such service and to promulgate rules and regulations affecting equipment, facilities and service to be thereafter installed, furnished, and used . . . . 366.07 Rates; adjustment. — Whenever the commission, after public hearing either upon its own motion or upon complaint, shall find the rates, rentals, charges or classifications, or any of them, proposed, demanded, observed, charged or collected by any public utility for any service, or in connection therewith, or the rules, regulations, measurements, practices or contracts, or any of them relating thereto, are unjust, unreasonable, insufficient, or unjustly discriminatory or preferential, or in any wise in violation of law, or any service is inadequate or cannot be obtained, the commission shall determine and by order fix the fair and reasonable rates, rentals, charges or classifications, and reasonable rules, regulations, measurements, practices, contracts or service, to be imposed, observed, furnished, or followed in the future. A proper perspective on the question of fuel adjustment charges is best gained by ignoring, for the moment, the immediate purpose and attendant policy of the various fuel adjustment clauses and focusing instead on the broader question: Can the commission by order delegate its rate-making function to the regulated utilities for any reason not provided for by statute? It is irrational to suggest that the legislature intended to grant the agency, upon which it conferred jurisdiction to protect the public welfare by regulating public utilities, the power to delegate away that jurisdiction to the extent that such utilities could measure their own costs and rate base, formulate for themselves a "reasonable" rate of return, and then determine for themselves the rates they would charge. Since the purpose of Ch.366, F.S., is "the regulation of public utilities" (s. 366.01), and since the Public Service Commission alone "shall have jurisdiction to regulate and supervise each public utility with respect to its rates" (s. 366.04), it follows that the commission can delegate neither all nor any part of its powers, but must supervise and regulate according to the procedures set out in Ch. 366, quoted, in part, hereinabove.
Procedural requisites are clear: "A public utility shall not, directly or indirectly, charge . . . any rate not on file with the commission" and "[w]henever the commission shall find . . . that the rates . . . charged . . are unjust, unreasonable, unjustly discriminatory . . . or such rates are insufficient to yield reasonable compensation for the services . . . the commission shall order and hold a public hearing . . . ." It is difficult to imagine an instance where a rate adjustment might be needed without the current rate being either too high, and, therefore, "unreasonable" and "unjust," or too low, and, therefore, "insufficient." If the current rate were reasonable, then for what purpose would it be modified? It is clear from the statutory scheme that the commission may not legally authorize utility companies unilaterally to modify any rate. Procedural safeguards — particularly a public hearing — must be followed. Fuel adjustment clauses typically circumvent notice and hearing requirements. They purport to excuse automatic increases in rates "directly or indirectly" charged by the utility. As the cost of fuel purchased by the utility escalates, the rate charged to consumers of electric power automatically increases. These automatic increases have on occasion been excused on the ground that added fuel costs are a charge and not a rate. To suggest that a fuel adjustment charge passed on to the public is somehow distinct from a rate, and that since s. 366.06, F.S., only requires notice and hearing before modification of rates, charges may be adjusted without regulatory safeguards, is to suggest that the legislature intended to leave a loophole in the statutory scheme designed to protect the public from just such arbitrary mechanisms. It suggests that, in s. 366.06, the legislature set out circumstances under which the commission must examine and prescribe reasonable rates, but did not intend to provide for the setting of reasonable charges. In any event, it is unnecessary to attempt a distinction between fuel adjustment charges and rates subject to regulatory provisions of s. 366.06 inasmuch as the commission itself recognizes that any such distinction is without a practical difference. In re Tampa Electric Co., Docket No. 70532- EU, Order 5278 (11/30/71), the commission, addressing the issue of fuel adjustment charges, noted that: . . . [W]hen a regulatory agency finds a rate structure to be fair, reasonable and compensatory at a time when fuel costs are at a given level, then any increases or decreases in such fuel costs quickly render such rates unfair or unreasonable regardless of whether fuel costs go up or down. Since changes in the cost of fuel "quickly render" rates unreasonable, and since s. 366.06, supra, requires certain procedures for adjustment of unreasonable rates, it is my opinion that each rate modification based on changed fuel costs may be made only after public hearing. The authority to modify rates may not be delegated to the utility company. If Ch. 366, F.S., bestows upon the Public Service Commission "the full power of the State to exercise exclusive jurisdiction for the protection of the public welfare in the regulation and supervision of the rates and services of public utilities" as was claimed in State ex rel. Shevin v. Yarborough, 257 So.2d 891, 892 (Fla. 1972), then the commission has no choice but to exercise its power in accordance with provisions of s. 366.06 each time a utility complains that increased fuel costs have rendered its rates "insufficient to yield reasonable compensation." Section 366.06(3), F.S. It has been argued that since most states have approved tariffs which include some form of escalation clause, rates based upon similar fuel adjustment clauses in Florida must be valid. While this argument appeals to a superficial approach to the question, it also ignores a very simple, but controlling, distinction: Most jurisdictions are not subject to a regulatory statute which commands a public hearing prior to every rate modification; Florida, as pointed out above, is. Your attention is invited to a pertinent article by R. S. Trigg at 106 U.Pa.L.Rev. 964 (1958) titled Escalator Clauses In Public Utility Rate Schedules. The author, who clearly favors the policy of such clauses, notes that fuel adjustment clauses are used in 44 states, but observes at pp. 965-966: Today utility rates in almost every state can and do fluctuate from month to month, with no fanfare and frequently no litigation. If this is not contrary to the regulatory statutes, it certainly is not what was anticipated by the draftsmen of those statutes. * * * * * In their inception, fuel clauses were designed solely to protect the utility's rate of return during an inflationary period; even the correlative protection to the consumer in times of recession was probably mere window-dressing in order to make the effects of the clause more palatable to the regulatory agencies. (Emphasis supplied.) The article describes several cases where escalation clauses conflict with statutory schemes: A few states, however, require that a public hearing be held before any increase is approved. The Illinois Public Utilities Commission, interpreting a statutory provision that "no public utility shall increase any rate . . . under any circumstances whatsoever, except upon a showing before the Commission and a finding by the Commission that such increase is justified," held: "This seems to contemplate a formal showing which would justify any increase allowed, and certainly does not contemplate the allowance of an increase of rates predicated on the bare statement of the public utility involved that it has paid a certain amount for coal." The Indiana Public Service Commission reached the same conclusion, although the statute involved did not specifically require a hearing. "[I]t should appear that the Commission is without power to confer authority for increasing rates contingent upon some future happening, and that it would be necessary for the commission to determine whether or not the price of coal had increased or decreased. Therefore it makes little difference whether the coal clauses are placed in the tariff or not, for the reason that it would be necessary for the Commission, either on petition of the consumer or the utility, to ascertain the prevailing price of coal before allowing an increase or reduction in rates, on the theory that no increase in rates can be allowed without a public hearing." There is no authority to the contrary, and it may be that the problem raised by this type of statute can be solved only by obtaining the repeal of the mandatory hearing provision. (Emphasis supplied.) Trigg at 990, 991. Finally, the article specifically addresses the following question: To what extent have statutory changes been necessary to legalize escalator clauses? With one exception the answer is "none." The exception is in cases where the regulatory statute required a hearing before rates were increased. Trigg, 995. Inasmuch as the Trigg article is more than sixteen years old, we have undertaken a survey of current statutory provisions relevant to authority of various utilities commissions to approve rates based upon fuel adjustment clauses. All state statutes were examined. Most current statutes concerning rate regulation are based upon the Federal Power Act. [See] 16 U.S.C. ss. 791-828. They require only a filing of proposed rates, usually twenty or thirty days prior to their effective date. If the regulatory agency determines it necessary, this period may be shortened. As a result, in many cases no investigation, much less a public hearing, is required. In only four states is a hearing required by law (California, Montana, New Jersey, and Florida). More than twenty states do not even require an investigation of proposed rates. The proposed rate automatically becomes effective absent some affirmative action on the part of the regulatory agency or interested parties. States having a basic statute modeled upon the Federal Power Act include: Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, District of Columbia, Georgia, Idaho, Illinois, Kentucky, Massachusetts, Montana, Nevada, New Mexico, New York, Ohio, Oregon, South Carolina, South Dakota, Utah, Virginia, Vermont, Wisconsin, West Virginia, and Wyoming. Of these, as previously noted, California, Montana, and New Jersey require hearings before rate changes. Of the remaining states, escalator clauses are approved by statute in Arizona, Arkansas, District of Columbia, New Mexico, New York, Ohio, Vermont, Washington, Virginia, Wisconsin and Wyoming. No cases from these jurisdictions have been found which discuss the necessity for, or public policy underlying, such statutes. Regulatory agency decisions which indicate at least tacit approval of escalator clauses can be found for Alabama, Colorado, Connecticut, Georgia, Indiana, Kentucky, Louisiana, Massachusetts, Maryland, New Jersey, New Mexico, Vermont, and West Virginia. In three states, fuel adjustment clauses have been rejected upon theories of inefficiency, 92 P.U.R.3d 254 (Mo.), and lack of hearing, 82 P.U.R.3d 410 (N.C.); 29 P.U.R.3d 237 (Mont.). In remaining states, no agency decisions could be found. In only one state, Illinois, was a pertinent decision of a state court reported. The Illinois Supreme Court, at 150 N.E.2d 776 (1958), held fuel adjustment charges to be necessary and desirable. However, the opinion also noted that under Illinois' regulatory scheme no hearing was required, and the burden of challenge was on the complaining party, not the regulatory agency. One state, Alaska, provides for escalator clauses in administrative rules and regulations. The statutory survey described above is helpful in understanding the apparent inconsistency in regulatory agency action. It demonstrates the controlling effect of hearing requirements in other jurisdictions. It is included in this opinion to demonstrate the weakness inherent in an argument that because most other states permit escalation clauses, Florida should permit rates based upon fuel adjustment clauses. It is not a question of whether Florida should join the majority, but whether Florida can follow majority practice. One is a question of policy; the other is a question of law. Florida is not subject to the policy of the majority of other states, but only to the clear commands of its own statutory scheme. But ignoring, for the moment, the legal effect of statutory hearing requirements, regulatory agencies are far from unanimous in
their approval of the policy argument in favor of fuel clauses. As Trigg observes: The reluctance of commissions to authorize this type of rate is clearly justified. The effect of such a rate is to allow increased charges because the [utility] is under economic duress, and reductions when forced by competition. At the time of the increase, no consideration is given to the utility's rate of return; nor to the relationship between rates to be increased and those to remain unchanged; nor, in fact, to the customer's ability (as distinguished from economic necessity) to pay. A regulatory commission which approves a rate of this kind is coming dangerously close to an abdication of its functions, and effecting indirectly a pro tanto repeal of the regulatory legislation. Trigg at 966. Testimony of O. Franklin Rogers, a professional engineer and electric utility rate expert, was referred to in a relatively recent opinion of the North Carolina regulatory agency further examining problems with fuel clauses. In re Duke Power Corp., 82 P.U.R.3d 410 (1970), it was noted that a fuel clause is not a valid basis for measuring the cost of service to customers. The particular fuel clause under consideration automatically increased electric rates without regard to the overall cost to Duke for providing electric service. It would have produced a rate increase irrespective of whether increases in Duke's thermal efficiency and plant utilization offset increases in cost of fossil fuels. It gave Duke and its suppliers power to increase all retail electric rates in the state by private contract. It gave Duke authority to determine for itself, on a month-to-month basis, what to charge per thermal unit without regard to whether the resulting rate per kilowatt hour was just and reasonable, without hearing testimony or receiving evidence of all elements of cost and other components upon which the rate of return was based, and without proper findings of the commissioner as to need or justification. It is not meant to suggest that all fuel adjustment clauses suffer for the same reasons, but only to indicate difficult policy considerations which must be met in dealing with such clauses even where there are no statutory hearing requirements. The foregoing discussion has been limited to application of Florida Public Service Commission statutes to commission orders and rates set thereunder. Also pertinent, however, are provisions of Ch. 120, F. S., which clearly require public hearings to the extent that the public's "rights, duties, privileges, or immunities" are determined in the rate modification process. Section 120.22, F.S. As I indicated to the Honorable Paula F. Hawkins in AGO 074-288, supra, the modification of rates which the public is obliged to pay to a state-franchised monopoly in return for electric power is clearly a matter affecting the public's rights, and the Administrative Procedures Act is applicable. The question then becomes how far mandatory hearing provisions of the Administrative Procedures Act can reach. Do they reach, for example, beyond privately owned power companies to include municipal and electrical cooperative utilities as well? The question is interwoven with the scope of Public Service Commission jurisdiction, and so is within the purview of your request. Section 366.02, F.S., defines a public utility as every corporation or other legal entity supplying electricity to the public. Municipally owned utilities, as, for example, the Jacksonville Electric Authority, are legal entities, yet municipal utilities and electric cooperatives are expressly excluded from the definition. Section 366.11, F.S., unambiguously immunizes "utilities owned and operated by municipalities . . . or by cooperatives" from Public Service Commission jurisdiction. Similarly, until the substantial revision of Ch. 120 by the 1974 Legislature, provisions of that act would not have applied to a city commission exercising legislative powers in regulation of a city utility. City of Opa Locka v. State ex rel. Tepper,257 So.2d 100 (3 D.C.A. Fla., 1972). Until this year, then, application of ss. 366.02 and 366.11, and Ch. 120, F.S., would have removed municipal utilities and electric cooperatives from public hearing requirements. Cf. State ex rel. Shevin v. Jacksonville Electric Authority, Case No. 74-1382, Duval County Circuit Court (Opinion filed 8 March, 1974). Except for such restrictions as may have been imposed by special acts, local ordinances, or rules and regulations of the cooperative, customers of these "nonregulated" utilities had no administrative forum before which they could complain. This resulted in the frequent inclusion of fuel adjustment clauses in contracts between the electric authorities and their fuel suppliers not subject to Public Service Commission jurisdiction. As if in recognition of these aforementioned difficulties, the 1974 Legislature substantially amended Ch. 120 and s. 366.11, F.S., Chs. 74-310 and 74-196(5), Laws of Florida. As a result of the interaction between these two statutes, neither municipal utilities nor electric cooperatives possess unrestrained authority to modify rates beyond January 1, 1975. Chapter 74-310, supra, provides, in part, that, effective on the operation date, (1) "Agency" means * * * * * (c) Each other unit of government in this State, including counties and municipalities to the extent they are expressly made subject to this Act by general or special law or existing judicial decisions. By Chapter 74-196(5), supra, s. 366.11, F.S., was amended effective July 1, 1974, to provide: No provision of this chapter shall apply in any matter other than as specified in section 366.04(2) . . . to utilities owned and operated by municipalities . . . or by cooperatives Section366.04(2), F.S., has reference to s. 1, Chapter 74-196, supra, which expands jurisdiction of the Public Service Commission to include, for a limited purpose, municipal utilities and electric cooperatives. In the exercise of its jurisdiction the commission shall have power over rural electric cooperatives and municipal electric utilities for the following purposes: * * * * * (b) To prescribe a rate structure for all electric utilities. The power to prescribe a rate structure thus extends Public Service Commission jurisdiction to the sensitive rate-making processes of all electric utilities operating within the state. The Supreme Court in Van Gorp Van Service, Inc. v. Mayo, 207 So.2d 425, 427
(Fla. 1968), observed that "[t]he Public Service Commission is an agency under and subject to control of Chapter 120." Therefore, it is my opinion that in prescribing municipal and electrical cooperative electric rates, the Public Service Commission must, as of January 1, 1975, afford prior notice and a public hearing as a requisite to allowing any rate modification whatsoever.